**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **HAND ARENDALL, LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 11-0150-KD-C |
| | ) |
| **MURRAY E. JOINER, JR., M.D.,** | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

This action came before the Court for a non-jury trial held July 16 and 17, 2012. Upon consideration of the testimony and exhibits presented at trial, post-trial briefs, and all other relevant portions of the record, the Court makes the following findings of fact and conclusions of law[1]:

**I. Procedural Background**

On February 28, 2011, Plaintiff Hand Arendall, LLC ("Hand Arendall") initiated this fee dispute action against Defendant Dr. Murray E. Joiner, Jr. ("Dr. Joiner") in the Circuit Court of Mobile County, Alabama (CV-2011-900465.00) for payment of $113,501.63 for legal services it allegedly performed for him throughout 2009 with regard to an attempted acquisition of Our Southern Home (an assisted living facility located in Mobile, Alabama). Dr. Joiner removed the action to this Court. After discovery concluded, Dr. Joiner filed a motion for summary judgment, which was denied.

---

[1] Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed. R. Civ. P. 52(a).

The non-jury trial was held on July 16 and 17, 2012. Before trial began, Hand Arendall clarified that its claim against Dr. Joiner was for breach of contract and not pursuant to the equitable theory of quantum meruit.

## II.     Findings of Fact[2]

At some time in 2008, Dr. Murray Joiner met Terry Hester, an Alabama businessman who arranged financing for the purchase of investment properties. Hester and Dr. Joiner discussed investing in nursing homes and assisted living facilities in the southeast. Hester told Dr. Joiner about Our Southern Home, Inc., an Alabama corporation that owned an assisted living facility in Mobile, Alabama. The owner and sole shareholder of the corporation, Lynn Weiss, had filed personal bankruptcy and the assets were being sold through the bankruptcy proceedings. Hester and Dr. Joiner discussed purchasing this facility as the first one in their investment plan. (Joiner trial testimony, Joiner deposition, doc. 44-1, p. 8-18). They agreed that Hester would assist in obtaining financing and Dr. Joiner would form Our Southern Home, LLC, to purchase the assets of Our Southern Home, Inc. It was also agreed that after closing the purchase, Dr. Joiner would transfer 40% ownership to Hester and they would be partners in the venture. (Hand Arendall Exhibit 7, Agreement; Exhibit 10, Letter of Intent to purchase). Thereafter, Dr. Joiner decided against forming Our Southern Home, LLC, to purchase the assets of Our Southern Home, Inc. Instead he decided to use Spreading Oak Development III, LLC, ("Spreading Oak") an existing limited liability company organized under the laws of Virginia, as the acquisition

---

[2] Unless stated otherwise, the findings of fact are taken from the testimony at trial, the post-trial briefs, and the documentary evidence submitted at trial.

2

entity. Spreading Oak was an entity without any assets. (Leatherbury trial testimony; Marshal deposition/trial testimony).

Dr. Joiner was represented by his long-standing attorney Heman Marshall, a partner at the Virginia law firm of Woods Rogers, PLC. Dr. Joiner hired Marshall to assist him with the acquisition of the facility. Nicole Ingle and Nick Conte, attorneys with Woods Rogers, also worked on the acquisition with Marshall.

In late December 2008, Hester and Xan Carvan, another person involved in the investment, contacted Gregory L. Leatherbury an attorney with Hand Arendall and told Leatherbury that Dr. Joiner and Hester intended to buy multiple nursing home facilities starting with Our Southern Home, Inc. Hester engaged Hand Arendall to perform transactional work for the purchase. Leatherbury confirmed this relationship in an email to Hester dated December 29, 2008 ("This will confirm that you have retained my firm on behalf of Regency Worldwide Development, Inc., a Delaware crop. (Regency) in connection with the proposed acquisition of the assets of Our Southern Home, Inc., and Lynn Weiss.") (Hand Arendall Exhibit 1). When Hand Arendall opened the client account – Terry Hester was named as the client and the "contact name" was "Regency Worldwide Partners". (Hand Arendall Exhibit 2).

In the morning of January 8, 2009, at 10:10 a.m., Hester emailed Dr. Joiner to provide the name and address for Leatherbury at Hand Arendall. Hester explained that Leatherbury was the attorney "we are using for contract and as closing attorney". (Hand Arendall Exhibit 3).

Dr. Joiner forwarded the email to Marshall at 10:40 a.m., stating

Please contact the attorney to make sure he knows your are (*sic*) in charge
even though he is helping us with my Alabama projects. I want to make sure

3

>he knows he works for me.  Also, he is preparing an agreement between
>Hester and myself.  Once we close we will become partners in these ventures.
>. . .

(Hand Arendall Exhibit 3).

Marshall responded at 11:11 a.m. and explained that Hand Arendall was the firm he recommended[3] and asked whether Hester or Joiner had spoken with Leatherbury. Marshall wrote: "If so, I will call him immediately and we will proceed." (*Id.*)  Dr. Joiner responded at 12:06 p.m.,

>[Hester] did speak with him.  We will make this a one time task situation.  Of
>(*sic*) you check him out and he meets your standards and you like him we can
>make this a long term relationship.  It will be your call. . . .

(*Id.*)

Later that day, Marshall called Leatherbury to discuss the rates to charge Dr. Joiner (Leatherbury trial testimony).   Then at 5:38 p.m. that afternoon, Marshall confirmed that conversation in an email to Dr. Joiner, explaining that

>I spoke with Greg Leatherbury this afternoon.  Apparently Terry has been
>speaking with him extensively over the last few days.  He advised that he
>was unsure exactly who his client was, but that he had sent Terry a
>representation letter covering Terry personally.  That has not yet been
>returned to him.  However, he is agreeable to handling it however you and
>Terry agree.  I had initially understood that he would be working for you,
>under our supervision, so this is an issue we will want to sort out quickly. . . .
>
>He indicated that Terry had asked him to also draft an agreement between
>you and Terry regarding the shared investment.  In his words, you would be
>"50/50 owners and co-managers with equal powers."  I advised that my
>understanding was 60/40 your way.   This of course highlights the fact that
>there could be some issue to be worked out between you and Terry before
>going on with the main agreements on the purchase.  Perhaps Greg can act

---

[3] Marshall testified that he had found Hand Arendall in Martindale-Hubbell and left a message with the Birmingham Office.  Coincidentally, Hester had contacted Leatherbury at the Mobile Office. (Marshall deposition, p. 40-41)

4

>       as Terry's counsel on the first step and we can represent your interests.
>       Once you and Terry have your deal drawn.  Greg would then act as local
>       counsel for the purchasing entity which would then be owned by you and
>       Terry.  We can continue to work with Greg and his firm in a joint effort.

(Joiner's  Exhibit 57).

Based on Leatherbury's understanding that he represented Hester, Leatherbury and Robert Riccio, another Hand Arendall attorney, began to prepare documents relative to the purchase of the facility including a Letter of Intent.  (Leatherbury trial testimony; Joiner Exhibit 66, email dated January 10, 2009, from Leatherbury to Marshall).  However, on or near January 14, 2009, during a conference call with Marshall and Ingle of Woods Rogers and Hand Arendall attorneys Leatherbury, Chris Gill and Riccio regarding the documents prepared by Riccio, the subject arose of preparing a new limited liability company and operating agreement.  (*Id*.)[4]  Leatherbury perceived the course of this conversation to indicate that Marshall and Ingle "were looking to [Hand Arendall] to represent Dr. Joiner". (*Id*.)  Leatherbury then told Marshall and the other attorneys that he had to have clarification regarding whom he was representing in this transaction and asked whether he represented Dr. Joiner or Hester.  Leatherbury testified, "they said you are representing Dr. Joiner." (*Id*.)

---

[4]  Dr. Joiner asserts that only Riccio and Gill participated in the conference call and that Leatherbury spoke to Marshall later by telephone.  (Doc 66, Joiner's post-trial brief). Regardless of whether Leatherbury sought clarification as to the identity of his client at the conference call or later in a separate conference with Marshall, Leatherbury's testimony that he left the conversation with the belief that Dr. Joiner individually was his client is credible.  This is particularly true in light of the fact that it is highly unlikely that the firm would agree to represent, without a retainer, an asset-free entity without some assurance of payment from another source.

On January 14, 2009, Leatherbury called Marshall to discuss the fee to charge Dr. Joiner, explaining that he did not want to charge more than Marshall. (*Id*.)   Also, that day, at 5:59 p.m., Marshal emailed Conte and Ingle to explain that he had spoken with Leatherbury and that "[h]e spoke with Terry Hester who is fine with his firm representing the acquiring entity.  Leatherbury is preparing an engagement agreement addressed to both Murray and Terry setting this out." (Joiner's  Exhibit 58).

Marshall also emailed Dr. Joiner, at 6:07 p.m. on January 14, 2009, as follows:

> I really need about 30 to 45 minutes with you on the phone to sort out all the issues in the Southern Home arrangement.  I spoke today with Greg Leatherbury, the partner on the file at Hand, Arendall in Mobile and I have gotten his representation straightened out.  We also had a conference call with the other lawyers at Hand Arendall who are preparing documents.  However, I want to go over all of the details of how you see this unfolding, . . .

(Hand Arendall Exhibit 11).

Marshall stated that he understood that "Hand Arendall was representing Terry Hester's interests and that we were jointly cooperating on the representation of the acquisition entity" which was Spreading Oak. (Marshall trial testimony by deposition, Marshall deposition p. 47).   Marshall stated that Hand Arendall represented the interest of Dr. Joiner "[i]ndirectly though the - - through our joint efforts for the acquisition entity" but not personally.  (Marshall trial testimony, Marshall deposition p. 54).

From January 14, 2009 until the purchase fell through in September 2009,[5] Hand Arendall continued to perform work on the acquisition with consultation and communication between Leatherbury, Riccio and Gill and Marshall, Ingle and Conte.

---

[5] Ultimately, Dr. Joiner and Marshall as well as Leatherbury and Riccio, determined that the facility could not generate the cash flow anticipated and the purchase was never completed. (Leatherbury, Riccio, Joiner, Marshall trial testimony).

6

Leatherbury and Riccio also communicated directly with Joiner during this time period. Numerous documents and emails were generated and many identified Dr. Joiner individually as Hand Arendall's client without identifying him as the member or manager of Spreading Oak.

Specifically, in February 2009, when disclosing certain conflicts of interest related to Hand Arendall's representation of two banks which held loans secured by assets of Weiss and Our Southern Home, Inc. and were creditors in Weiss' personal bankruptcy, the conflict of interest waivers sent to Dr. Joiner by way of Marshall and Leatherbury identified Dr. Joiner in his individual capacity without designation as Spreading Oak's manager or member (Hand Arendall Exhibit 15).   Marshall discussed these conflict of interest waivers with Dr. Joiner.  (Marshal deposition p. 82).    The conflict of interest waivers were never signed or returned to Hand Arendall.

Also, Leatherbury emailed Dr. Joiner in May 2009 to confirm their conversation of that date. (Hand Arendall Exhibit 55).   Therein, after addressing the status of the potential "bid off" to purchase the assets of the facility in the bankruptcy court, Leatherbury concluded with "We are all trying to protect your interest and make sure that you do buy this facility . . . and do everything in our power to be sure you buy this facility on commercially reasonable terms . . . Our goal is to get this deal done, period."  (*Id.*)

Moreover, emails from May to September 2009, on which Dr. Joiner was copied or addressed, indicated that Hand Arendall believed their client to be Dr. Joiner.   A May 2009 email addressed to Travis Bedsole, Bankruptcy Court Administrator, clearly stated, "[w]e represent Spreading Oak Development III, LLC (and Dr. Joiner, one of its principal[sic]) (Pl. Exh. 52).  Another May 2009 email to Dr. Joiner stated, "I don't disagree at all with your

7

thoughts, and you are the client." (Pl. Exh. 58). In a September 2009 email to attorney Jeffrey Hartley, Hand Arendall again stated that they represented Dr. Joiner.

In late July 2009, Hand Arendall first invoiced Dr. Joiner individually, in the amount of $91,610.37. In early August 2009, Dr. Joiner met with Hand Arendall attorney Robert Riccio to discuss the financial status of the facility. They met with the accountant for the corporation and the manager of the facility. At this meeting, Dr. Joiner and Riccio learned that the financial status of the facility likely would not generate the cash flow necessary to make this investment profitable. In a private meeting that same day, Riccio advised Dr. Joiner as to the viability of the facility and whether Dr. Joiner should move forward with the purchase. Dr. Joiner expressed concern over the amount of money invested to date, including attorney's fees due to Hand Arendall and Woods Rogers. Dr. Joiner told Riccio that he would pay Hand Arendall's attorneys fees as well as the fees of Woods Rogers. (Riccio trial testimony). The amount due increased to $104,547.95 by late August and increased to $116,783.63 by late September 2009.

In early October 2009, Weiss's attorney contacted Leatherbury about refunding Dr. Joiner's $5,000 earnest money deposit held in trust. At Dr. Joiner's direction, the attorney issued a check payable to Leatherbury which he then endorsed payable to Hand Arendall. The money was credited to Dr. Joiner's account. (Hand Arendall Exhibit 22, Leatherbury trial testimony). Leatherbury wrote a note to Dr. Joiner:

10-5-09

Murray,

Per our discussions and as stated above by Rick, we are applying the attached check as a payment on your account.

Greg

(Hand Arendall Exhibit 22).

Numerous emails among Dr. Joiner, Leatherbury and Marshal were sent during the next few months. The emails addressed Weiss' bankruptcy proceedings and the facility's sale in bankruptcy at a substantially lower price than originally offered by Dr. Joiner as well as payment of fees incurred by both Marshall and Leatherbury. Hand Arendall sent another invoice in December 2009. In October 2010, the last invoice before the complaint was filed showed a balance due of $113,501.63.

### III. Conclusions of Law

#### A. Venue, Jurisdiction and Choice of Law

This Court has personal jurisdiction over the parties and the Southern District of Alabama is a proper venue. This action was removed on basis of diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1) (doc. 1). "[A] federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Therefore, the Court must decide which state's law governs this action between Hand Arendall, a citizen of Alabama and Joiner, a citizen of Virginia.

"Alabama law follows the traditional conflict-of-law principles of *lex loci contractus and lex loci delicti*." *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, 17 So. 3d 200 (Ala. 2009). Thus, contract claims are governed by the laws of the state where the contract was made, unless the contracting "parties have legally contracted with reference to the laws of another jurisdiction". *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991); *Kruger Commodities, Inc. v. U.S. Fid. and Guar.*, 923 F.Supp. 1474, 1477 (M.D.Ala.1996) ("The

9

general choice-of-law rule in Alabama is *lex loci contractus*, which provides that 'a contract is governed as to its nature, obligation, and validity by the law of the place where it was made.'") (citation omitted). This breach of contract action is governed by the laws of the State of Alabama because the parties have not contracted otherwise.

**B. Evidentiary Rulings**

At trial, the Court took under submission the admissibility of Hand Arendall's Exhibits 19 and 21. Exhibit 19 is an email dated September 21, 2009, from Dr. Joiner to Marshall with an email from Leatherbury attached. In the attachment Leatherbury asks Dr. Joiner for permission to have Weiss' bankruptcy attorney transfer the deposit to Hand Arendall to apply as a payment on the balance due. Dr. Joiner asks Marshall for advice on how to word his response to Leatherbury. Exhibit 21 is an email dated September 28, 2009, from Dr. Joiner to Marshall wherein Dr. Joiner offers a solution to payment of the amount owed to Woods Rogers, discusses payment of Hand Arendall's fees, states his displeasure with certain aspects of its representation, and expresses his opinion that Hester should also be responsible for payment of attorney's fees and costs incurred in their failed business venture.

Hand Arendall sought admission of these exhibits as evidence of mutual assent to the formation of a contract between Hand Arendall and Dr. Joiner individually. Specifically, it points to Dr. Joiner's statement: "I want to make everyone whole" and Dr. Joiner's statement: "I will get everyone taken care of." Hand Arendall argued that the emails at issue do not involve legal advice since there was no litigation at that time and other similar emails have been found not to be subject to the attorney-client privilege.

Rule 501 of the Federal Rules of Evidence addresses privilege in general and states,

in relevant part, that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."[6]  In this diversity action, the law of the State of Alabama supplies the rule of decision.  In that regard, Rule 502 of the Alabama Rules of Evidence governs the attorney-client privilege in Alabama.  The Rule states in pertinent part as follows:

> (b) General Rule of Privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client or a representative of the client and the client's attorney or a representative of the attorney, or (2) between the attorney and a representative of the attorney, (3) by the client or a representative of the client or the client's attorney or a representative of the attorney to an attorney or a representative of an attorney representing another party concerning a matter of common interest, (4) between representatives of the client and between the client and a representative of the client resulting from the specific request of, or at the express direction of, an attorney, or (5) among attorneys and their representatives representing the same client.

Ala. R. Evid. 502(b).

Under Alabama law, the existence of a privileged communication "is a question of fact to be determined by the trial court from the evidence presented." *Exxon Corporation v. Department of Conservation and Natural Resources*, 859 So. 2d 1096, 1103(Ala. 2003) (citation omitted).  Dr. Joiner, as the "party asserting the attorney-client privilege bears the burden of establishing that the privilege attaches to the documents requested." *Ex parte*

---

[6] The email communications appear to have been sent between Dr. Joiner and Marshall in Virginia.  However, as Rule 501 explains Alabama law supplies the rule of decision and therefore, also governs privilege.  Dr. Joiner raised his objection under Alabama law. (doc. 55, joint pretrial document, p. 12).  In opposing the objection, Hand Arendall argued pursuant to Alabama law. (doc. 65, post-trial brief).  However, the same result would obtain under Virginia law. *SNC-Lavalin America, Inc. v. Alliant Techsystems, Inc.*. 2011 WL 4716225, 1 (W.D.Va. Oct. 6, 2011) ("Accordingly, '[t]he attorney-client privilege does not attach to a document merely because a client delivers it to his attorney.' . . . Instead, the communication must be for the purpose of procuring or providing legal advice.") (citation omitted).

*Tucker*, 66 So.3d 750, 753 (Ala. 2011) (citation omitted). "The general rule is that an attorney cannot disclose the advice he gave to his client about matters concerning which he was consulted professionally, nor can the client be required to divulge the advice that his attorney gave him." *Ex parte Meadowbrook Ins. Group, Inc.*, 987 So.2d 540, 550 (Ala. 2007) (citation omitted). However, "[t]he attorney-client privilege generally does not exempt the attorney from testifying to the fact of the attorney's employment, the name of the person so employing and the terms of the employment. This general rule includes disclosure of the fee arrangement." *Ex parte Tucker*, 66 So.3d at 753 (quoting 2 Charles W. Gamble, *McElroy's Alabama Evidence* § 392.02 (6th ed. 2009)) (footnotes omitted). Also, "information regarding a fee arrangement and the identity of the person paying the fee falls outside the protection of the attorney-client privilege." *Id.*, (quoting *In re Grand Jury Proceedings in re Freeman,* 708 F.2d 1571, 1575 (11th Cir.1983))

The burden is on Dr. Joiner to establish that the information contained in the emails constituted legal advice from his attorney Marshall instead of a disclosure of the fee arrangement with Marshall or Hand Arendall. At trial, Dr. Joiner argued that the attorney-client privilege applied to these exhibits because he was seeking legal advice from Marshall as to how to handle the dispute about attorney's fees after the transaction failed; he was not seeking legal advice pertaining to the acquisition of the facility (the subject of joint representation).

The Court finds that Dr. Joiner has met his burden to establish that these emails are subject to the attorney-client privilege. Specifically, the Court finds that the emails address different legal issues than the purchase of the facility and the joint representation. Dr. Joiner seeks advice from Marshall regarding the debt owed to Hand Arendall. Therefore,

the objection is sustained.

### C. Alabama Law on Contracts

"The "elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Allen v. Baker*, - - - So. 3d - - - , 2012 WL 2161629, 5 (Ala. Civ. App. June 15, 2012) (citing *Shaffer v. Regions Fin. Corp.,* 29 So.3d 872, 880 (Ala. 2009) (quoting *Reynolds Metals Co. v. Hill*, 825 So.2d 100, 105 (Ala.2002)). "The elements of a valid contract include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Ex parte Jackson County Bd. of Educ.*, 4 So.3d 1099, 1103-1104 (Ala. 2008), (citing *Ex parte Grant,* 711 So.2d 464, 465 (Ala.1997) (quoting *Strength v. Alabama Dep't of Fin., Div. of Risk Mgmt.,* 622 So.2d 1283, 1289 (Ala.1993)).

"The purpose of a signature on a contract is to show mutual assent[.]" *I.C.E. Contractors, Inc. v. Martin & Cobey Const. Co.*, 58 So. 3d 723, 725 (Ala. 2010) (quoting *Bowen v. Security Pest Control, Inc.,* 879 So.2d 1139, 1142 (Ala.2003) (quoting *Ex parte Rush,* 730 So.2d 1175, 1177–78 (Ala.1999)) (internal citations omitted). "[H]owever, the existence of a contract may also be inferred from other external and objective manifestations of mutual assent. Unless a contract is required by a statute to be signed . . . or by the Statute of Frauds to be in writing . . . or unless the parties agree that a contract is not binding until it is signed by both of them . . . it need not be signed by the party against whom enforcement is sought, provided it is accepted and acted upon." *Id.*, at 725-726.

"A contract implied in fact requires the same elements as an express contract, and differs only in the 'method of expressing mutual assent.' Implied contracts normally arise in

13

situations where there is a bargained-for exchange contemplated by the parties, but no overt expression of agreement." *Ex parte Jackson County Bd. of Educ.*, 4 So.3d 1099, 1103 - 1104 (Ala. 2008) (quoting *Ellis v. City of Birmingham,* 576 So.2d 156, 157 (Ala.1991) (quoting *Berry v. Druid City Hosp. Bd.,* 333 So.2d 796, 799 (Ala.1976)). "Conduct of one party from which the other may reasonably draw the inference of assent to an agreement is effective as acceptance." *Ex parte Rush* at 1178.

### D. Analysis

There is no dispute that Hand Arendall provided legal services, that Joiner has refused to pay the balance due for those services, or that Hand Arendall has been damaged by the failure to pay. The issue is whether a contract was formed between Hand Arendall and Dr. Joiner, individually, or only as to Dr. Joiner as the manager of Spreading Oak.[7] The Court has considered the evidence presented and finds that the preponderance of the evidence shows that Dr. Joiner in his individual capacity, personally and by way of his attorney's communications with Hand Arendall, assented to the formation of a contract for legal representation by Hand Arendall. This representation began on January 14, 2009.

There was no written expression of assent from Dr. Joiner. Thus, the Court looks to the actions of each party to determine whether there was mutual assent to an arrangement wherein Hand Arendall would represent Dr. Joiner in his individual capacity. The first evidence of assent comes from the testimony that on January 14, 2009, a telephone conference was held wherein it was conclusively agreed between Dr. Joiner's agent, Heman Marshall, and Hand Arendall that Hand Arendall would represent Dr. Joiner.

---

[7] There is no credible evidence to support the argument that Hester was the only client represented by Hand Arendall.

Next, and most convincing, is the way the conflict of interest waivers were prepared and handled.  The conflict of interest waivers clearly show Dr. Joiner as the client.  In February 2009, Dr. Joiner received and reviewed with Marshall the conflict of interest waivers, which were prepared for his signature in his individual capacity.[8]  Thus, Dr. Joiner was clearly on notice that Hand Arendall believed its clients to be Dr. Joiner and Hester in their individual capacities.  Although Dr. Joiner did not return the waivers, he also did not disabuse Hand Arendall of its alleged misconception that Hand Arendall represented him on an individual basis.   This is certainly conduct of Dr. Joiner from which Hand Arendall could, and did, reasonably draw the inference of assent to an agreement.  Also, a reasonable inference of assent is drawn from the silence of Dr. Joiner between May and September 2009, when Hand Arendall represented to the Bankruptcy Administrator, to attorney Jeffrey Hartley, and to Dr. Joiner, that it represented Dr. Joiner in the transaction.

Mutual assent is also seen in Dr. Joiner's interactions with Hand Arendall attorneys.  Dr. Joiner personally communicated with Hand Arendall attorneys to give them specific directions about proceeding on his behalf to purchase the facility.   This includes continuing to seek legal advice even after receiving Hand Arendall's bill, which indicated that Dr. Joiner was the client being held responsible for the legal bills.

In sum, the totality of the evidence weighs in favor of a finding that Dr. Joiner assented to Hand Arendall representing him on an individual basis in purchasing the facility.

---

[8] After five months, the Asset Purchase Agreement for the failed venture was signed by Dr. Joiner as the manager of Spreading Oak on April 29, 2009 and submitted to the Bankruptcy Court on May 14, 2009 (Joiner Exhibit 5).

**E.  Damages**

Under Alabama law, damages for breach of contract "should return the injured party to the position he would have been in had the contract been fully performed." *Hill v. Premier Builders*, 56 So. 3d 669, 678  (Ala. Civ. App.  2010).  The parties presented no dispute as to the accuracy of the attorney's fees or the reasonableness.  Hand Arendall has provided the affidavit of Harwell E. Coale, Jr., as evidentiary support for the reasonableness of the hourly rate and the time incurred (Hand Arendall Exhibit 24).   Accordingly, the Court finds that the fees are reasonable.

However, the Court is unable to determine from the evidence submitted what the total of the fees are starting on January 14, 2009, as the requested damages appear to begin with services rendered before January 14, 2009.   Hand Arendall has until September 7, 2012, to amend their request for damages, with explanation, to conform to the court's factual findings.

**IV.   Conclusion**

For the reasons set forth herein, it is ORDERED that the Court finds in favor of Hand Arendall on Count One of its complaint for breach of contract.

**DONE** and **ORDERED** this the 31st day of August, 2012.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**